C. Venezuela S.A. and C.D.D.S.A. Petroleo S.A. Appellant. Ms. Wimberly for Appellant Bolivarian Rep. of Venezuela. Mr. Pezzurio for Appellant Petroleco C. Venezuela S.A. et al.   Ms. Ogden for Appellant Petroleco C. Venezuela S.A. et al. Good morning, Your Honors, and may it please the Court. My name is Mary Helen Wimberly, and I represent the Republic of Venezuela this morning. I'm going to be splitting my time with Mr. Pezzurio, Counsel for Pay-to-Visa. I'll be addressing the expropriation issue, and Mr. Pezzurio will be addressing the breach of contract issue. The gravamen of the expropriation claims in this case is the seizure of oil rigs and related property in Venezuela by sovereign Venezuelan entities. In order to assert this Court or U.S. Court's jurisdiction, the plaintiffs had to show that they put rights and property taken in violation of international law in issue. That they failed to do. H&P IDC, the American parent company, has failed to do that because it didn't own or possess the rigs or the property that was seized. Can I pause over this for one second? We're here on the collateral order doctrine theory, is that right? That is correct. So I'm a little confused as to how this issue has been conclusively determined in the Court. How the IDC issue has been conclusively determined? Yes, well, on how the lack of sovereign immunity has been determined. Well, this Court, and I believe it actually may have been the Chabad case, has held where there's a partial motion to dismiss that it's denied. But even that partial denial of sovereign immunity... When you say partial, what does partial mean in those cases? Meaning that on one particular issue, even. I don't remember a case like that. And I apologize, I can't recall the case. It is the case that we've said that if it's on the law and not also on the facts, I just don't remember the partial issue part. It seems to me that even if there are rights and property here, certainly you agree that that's not enough to deprive you of sovereign immunity, right? That's correct. And there has to at least be violation of international law. Yes, that's correct. And the district court didn't decide that there was a violation of international law. That's correct, Your Honor. And the district court... And then the second part, are we talking about property? The second part of the requirement, which is itself a two-fold part. Yes, Your Honor. Which of the two folds are we on here? That property was exchanged as present in the United States or that the property exchanged as owner-operated by instrumentality? Which of the two folds here? The nexus requirement is not before this Court right now. I don't know, but which of the two nexus requirements? Are at issue below? Yeah. I believe the owner-operated nexus requirement is still at issue below. Right. And I take it you certainly take the position that it wouldn't be satisfied. Yes, Your Honor. That's correct. So I'm unclear as to why we have interlocutory jurisdiction here. It's one thing to say that a sovereign should not be required to go forward in the court below on the merits or even on the facts, but here we don't even know that you're going to be required to go forward. Well, I think there was a sufficient basis for dismissal on sovereign immunity grounds that was rejected below, and that is sufficient to bring this case up on appeal. Well, then we would be up here with every word of the statute, every single element. You come up, you lose, you go back down, and you start again. You come back up, and it doesn't really seem like an efficient way to do this, nor is it one that deprives the sovereign of its immunity from a merits determination. Well, what we were trying to do is separate the issues that were potentially required jurisdictional discovery from those that were straightforward questions of law. The nexus issue was, I believe, the other side requires some extensive jurisdictional discovery. So in terms of efficiency and in terms of protecting the sovereigns from the burdens of litigation, which the court has held is the purpose of sovereign immunity, we've asked to both sides have actually stipulated to questions of law for the court to determine on appeal under the collateral order doctrine. No, I understand that, but you can't stipulate to our jurisdiction. Yes, I understand your question. But you're saying that on the latter set of questions, those are fact and not law. There are no law questions on the second half of the requirements of the foreign sovereign. What about the violation of international law? Isn't that a law question? Yes, that's correct, Your Honor, and that's the H&P Venezuela issue that we'll be discussing as well this morning. I don't believe the final judgment rule that you're referring to about, you know, that all the individual issues have been decided applies quite as clearly as it does in other cases when we're referencing sovereign immunity. I think it is and can be an issue-specific determination. And in this case, there's certainly been extensive briefing on these issues, I think, sufficient to bring it to this Court's ability to resolve the case, and certainly we're arguing these decisions, the issues that are on appeal, will resolve the case. All right. Why don't you sit down and have a chance to look. If you find a case that says this can be done on an issue basis, I'd appreciate it. Yeah. Go ahead. Again, before the Chief Judge asked you that series of questions about jurisdiction, you said that with respect to the rights and property issue, that HTIDC did not own the property here. Right. But this part of the statute doesn't talk about ownership. It talks about rights and property, and the instrumentality section of the Sovereign Immunity Act does talk about ownership. So, I mean, Congress knew the difference, and so I'm not sure why ownership is the issue here. Rights and property are the issue here. We certainly agree. I was going to say that, but you said that means ownership. I think I said ownership of that. Right. That was dealing with a different section of the statute, one that actually does deal with ownership, whereas this section deals with something different, rights and property, and they seem different to me. I think, for example, your rights and property can be interfered with without your right to ownership to be interfered with. But generally, for example, possession would derive from your right of ownership, which is essentially what's happened here. The rights of possession of H&P Venezuela's rights of possession has been interfered with, even though it retains the title. But, you know, these rights and property don't exist in the air. They have to be tethered to something, most commonly of ownership, but it can also be contractual rights, such as in the Memoriam case where this court found a property right arising out of the contractual right to demand payment. What we're saying is, given the corporate separation and the corporate formalities, which goals did state Congress had taken into consideration? Well, there are different provisions. Suppose I don't agree with you about this. Suppose I think rights and property is different from ownership. What's your argument then? Then still, H&P IDC does not have rights in property and the assets of its subsidiary. That's a universal principle of corporate law. Well, no, now you're going back to the concept of ownership. I mean, as I understand the record, H&P IDC bought this equipment, right, managed it. They're a 100% owner. They own 100% of the stock of HTV. In other words, it sounds like the cases at the other sites, franchise tax and franchise tax board in Ramirez. Respectfully, I don't believe I'm going back to ownership. I believe there is a right line between what the rights in the corporation, which is distinct from the corporation's rights and its assets. And I believe it's stated most expressly in the Barcelona Traction case, where I think it, in order for clarification, talks about a shareholder's interest in the corporation and in the corporation's rights and its property. So there is a bright line that H&P itself adopted when it elected to incorporate separately in Venezuela and when it elected to give its Venezuelan subsidiaries the oil rigs and not retain ownership over them. H&P's problem in inserting this court's jurisdiction is in its own making. It did not have to under Venezuelan law or the contracts here separately incorporate in Venezuela. It certainly did not have to hand over the oil rigs to its Venezuelan subsidiary. It also could have inserted some sort of contractual provision, an arbitration clause, for example, to protect its rights. It didn't do that. Now, the other side says these are rare and exceptional circumstances. Well, we disagree with that. It's rare and exceptional that this uses in the United States, but most commonly these cases are arbitrated, pursuant to arbitration provisions, resolved through diplomatic channels or through ICJ proceedings, for example. So, again, H&P's business decisions are what present the bind it finds itself in today. And briefly, with respect, and I certainly don't want to go intrude on my colleague's time. It's all right, because I have some more questions. Okay. So, what about the decision in our Ramirez-Arellano case that if you take, if it's a sole shareholder, and you basically seize all the interests, that that counts? Well, the Ramirez, I think there's several problems with the Ramirez case. What's the first problem? The first problem, it was, of course, Juviard. It was vacated and remained by the Supreme Court. You understand what our rule is about those? Well, the judgment, I understand, was vacated. I'm going to read you our rule. This is from a 2006 case called Adamani. When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding, the panel opinion, that holding continues to have potential weight. In the absence of contrary authority, we do not disturb it. Yes, I understand that. I think that, on top of the fact that it's never been cited in the 30 years since then on the property rights issue, only on the political question issue where all the judges agree. Why does it matter whether it's ever been cited? We don't have a rule that says if we don't cite something for 30 years, it self-destructs. Well, I think – It might not be a bad rule, but it saved a lot of paper and stuff. Let me move to the second reason. It's a due process case. Well, the problem with that is this talks about rights and property. A due process is a basis for a right and property. And not to split hairs, but the due process – That's what we do here. We stand for the right and property. That's a deal. The due process clause is interpreted to apply to interests and property, which I've noticed in the ICJ decisions, like I just said earlier, seems to be distinct from rights and property. Interest seems to allow for a broader understanding. And, of course, here we're talking of rights that have to be taken, not just interests that are affected or diminished, but the right to the property has to be taken, which I think is a distinct area of the law. And, again, the court in Ramirez repeatedly limited itself to the due process clause. Well, it's cited – the principal support is Fletcher's Cyclopedia of the Law of Private Corporations. It's basically analysis of corporation law. Whether you think it's right or wrong, that's what it's based on. And I think it was an unusual decision. It's not entirely clear what the basis for the decision was because it seems that – well, you can make that argument to the en banc court, but the question of whether this case was rightly decided is one that we just don't have any authority to even think about. Well, I think it can distinguish the case on the due process grounds. I think that's a fair distinction when you're talking about different sources of law, and particularly when you have Dole Food coming in as intervening authority with respect to the Foreign Sovereign Immunity Act, saying that Congress had corporate formalities in mind when it was enacting the Foreign Sovereign Immunity Act. But it's a different section that they were talking about. Well, I think the court used broad language to say the act generally. Of course, the support was that particular section. I agree with you, Chief Judge Garland. But it said that the act generally demonstrated that it had corporate formalities in mind. Yeah, but it didn't have this provision before. And this provision has different language. I agree, but I think it would be passing strange that the court had corporate formalities in mind in one provision and the same enactment in another provision abandoned them, which, by the way – Well, but that's because Congress wrote the two provisions differently and used different language. Well, I believe rights and property have a distinct meaning in corporate law. So for the same reason ownership has a distinct meaning in corporate law, rights and property do as well. And, again, if the court was planning – or Congress, excuse me – was planning to legislate an abrogation of the common law, it needed to be clearer. Could you give a one-sentence definition of what that clear meaning of rights and property is? I believe that – You're the one who's asking. I know. I'm asking for that question. I believe it's either right of ownership or possession. That is the only thing that I have seen in the case law when it comes to property rights, ownership or possession, at least with respect to when property is being taken. If there are other rights, this would be the first time I believe the court would be recognizing them in this context. Certainly the right to control through ownership of shares is considered a right. But, again, that's a right grounded in ownership. Like I said before, you know, the broader rights – we're talking about use, possession, control – are grounded in something more concrete, typically, such as contract or ownership. And, again, this would be a remarkable ruling that in this one area of the law, which is that this court, Helen Peterson, is not a particularly generous exception to sovereign immunity, that this court is going to read shareholders' rights more generously than it does in any other area of the law. Isn't all that's required here is that their claim be colorable? Judith's case at 941 and Nook 3 says that the plaintiff has to put its own rights at issue. Then if you look at Peterson, this court analyzed fairly closely whether the plaintiff had put its own rights at issue, and that was with respect to employer contributions to a Saudi Arabian retirement fund. Are you saying that the question – that element of the sovereign immunity's defense, of the exception, rights and property, you think is not subject to the rule that all that's required is a colorable claim? I don't think I have to disagree with that proposition, because here we're talking about categorical legal rules. So if we're saying as a categorical legal matter the corporate parent has no rights in its subsidiary's property, then that's not a colorable claim. After the Ariannos case, isn't it at least colorable? I'm sorry, what? The Ariannos. I'm bad on the pronunciation. Ariannos. Okay. Isn't it a colorable argument that they have rights and property? I don't believe so. Not even colorable? No, Your Honor, because of these categorical legal rules that we're asking the court to apply. And I mean, certainly, if you want to say, okay, just the fact that they've said in their complaint that they have that right, then this court denounces them. No, no, on the law. The question of whether it's a colorable argument that you have legal rights, that a sole owner has legal rights in the circumstances that they've described here. No, Your Honor. What if they had seized the subsidiary outright? Well, and just so we're clear on terms, if they've taken the shares. No, not if they've taken the shares. What if they've prevented it from operating as a going concern, taken every single asset of it so that it's nothing but a shell? No. No, no what? No. Sorry, Your Honor. No, that would not be a colorable claim. Because if you look at Barcelona Attraction as an example, there's a very straightforward and categorical rule that if it still exists as a legal entity, that corporation can assert its own rights. It still exists. It has not been taken. Suppose the government entity actually says we are nationalizing this corporation. Does the parent corporation then have a protectable or at least colorable legal right? I have to be careful with what precisely you're asking, because if as a matter of political and inflammatory rhetoric they say to the, you know, crowd they've taken the company, no, I don't think that. I don't mean a political pronouncement. Okay. I don't know what the legal structure is under which it was seized. Suppose they say we hereby seize this corporation. It now belongs to the government. It and all its assets belong to the government. Does the parent corporation not then have a legal right? I believe that's the Cuban bank cases, Your Honor. That's exactly what happened. I think it probably is. And they said we take all shares, we take all title, you know, delete the corporation's name and put our name in its place. And that's basically how there has been a taking of the corporation. Here, of course, H&P Venezuela, as you'll notice, is a plaintiff asserting its own claims. And, again, H&P Venezuela has voluntarily taken on the nationality of Venezuela, therefore subjecting it to Venezuelan government, Venezuelan laws, and loaning the remedies that are available to it in this court, in this forum. So, again, I have to return back to the fact that we're asking this court to apply bright line, well-defined rules that are universally applicable that render H&P IDC claims not colorable because it does not have rights in a corporation's assets. The corporation still exists and is a co-plaintiff in this case. And that H&P Venezuela has not stayed a colorable claim because as a national Venezuela, it has no ability to assert an international law violation. At least on that ground, we agree with the district court. Now, I'm a bit over my time. I don't want to continue or to prejudice my co-colleagues' rights. So, if there are no further questions. Okay. Thank you, Your Honors. Good morning, Your Honors. Please support. My name is Joseph Pizzurro. I represent the PDVSA defendants, PDVSA and PDVSA Petroleum. I'm going to address the contract claims, the jurisdictional issues on the contract claims. But before I do, perhaps I can answer the question that Judge Garland had. Before you do that, Mr. Beecher, I'm a little slightly confused with how we're going to go through these. What about H&PV's expropriation claim? Their expropriation claim? H&PV's expropriation claim? Yeah. I'm happy to address any questions Your Honor. That was counsel for the public. I see. But I'm happy. If the court has any questions for me, I'm happy to answer them. Well, I guess it seemed like we didn't quite get to that one there. We only got to the other one. Well... This is the question of whether discrimination against a company based on its foreign ownership is a violation of international law, etc. Yes. Would you like me to address that one? Yeah, I think that would be helpful. Okay. Before we come to the other one. The rule of international law, which was extant at the time the FSIA was passed, and continues to be the rule of international law today, is that the nationality of a corporation is deemed to be its place of incorporation, and the international law obligations of a foreign state or any state are never engaged with respect to the actions it takes with respect to its own citizens, at least in respect to the incorporation of property. HRP Venezuela is a Venezuelan corporation. So, again, my question is a variant from the question I was asking before about colorability. Given Sabatino and Farr, isn't the argument at least colorable? And under our Chabad case, isn't that all that's required? We don't think it's colorable at all. Even when there's Second Circuit authority on the position? Your Second Circuit authority, first of all, predates the Foreign Cyber Mutuities Act. It was based upon what the Second Circuit perceived to be as a trend in international law. They were wrong. It was not a trend, and, in fact, it was repudiated by the ICJ in Barcelona traction, and that repudiation was, again, in the Diallo case, I believe, relatively recently, was reaffirmed. Well, but the restatement continues to describe it as a legitimate principle. No, it doesn't, Your Honor. In fact, the restatement second, there was some ambiguity in the restatement second of the foreign relations law as to whether or not this was the case. The restatement third is very clear, and it's different, and it says that the nationality is the nationality of the place of incorporation. But it says, it goes on to say, it goes on to continue to describe Sabatino. It just limits its facts to situations where the seizure is actually aimed at Americans because they're Americans, right? I'm not sure, Your Honor, that that's, and even if that is the case, no case is ever so held, and I want to point something out to the Court. When you read the complaint, and when you read the declarations and official proclamations that are incorporated therein by reference, there is absolutely nothing to suggest that the expropriation of these rigs was done because H&P Venezuela was owned by an American company. Okay. Now, then, if you're arguing, if what you're doing is attempting to distinguish Sabatino, then if that's it, then Chief Judge Garland's question comes right back, which is, is it a colorable distinction? In other words, it's one thing for you to say Sabatino's no longer good law. That is opposition, Your Honor. Yeah, but the restatement suggests that, at least on its facts, it is good law. And if that's what the argument is about... Well, I'm not sure, Your Honor, with respect, I'm not sure I agree with Your Honor that the restatement is so categorical, and even if the restatement was so categorical, that would have to stand on the one hand and face the ICJ pronouncements on what international law is, and we believe that this court would have to go with what the international court has said international law is, as opposed to what the restatement third might imply, and I'm not sure it is that strong. So we're bound, in other words, the Foreign Sovereign Immunity Act is bound to honor a single decision by the ICJ? It's not a single decision, Your Honor, and the question is, what is international law? This entire issue is whether there was a taking of rights and property in violation of international law. But is the intention of the Foreign Sovereign Immunity Act to leave that question to a single panel of the ICJ making a decision? No, Your Honor. So just because that, even if the panel is as you describe it, I'm sure we're going to hear from the other side that it's not as you describe it, but if it is, how does that resolve the matter for us? Because, Your Honor, when Congress passed the Foreign Sovereign Immunity Act, it must be assumed that it was aware of what the state of international law was at that time, and there was no real dispute. Remember, you have a single decision, essentially a single decision by one circuit court in the United States, based upon what it identified as a trend in international law in and around 1962, I believe was the date of the decision. Subsequent to that, in 1970, Barcelona Traction came down. The doctrine, the writings of what is international law were very clear that the view in international law was the Barcelona Traction view, not the Sabatino view. And when Congress passed the statute, it had to have understood that this was the state of international law at that time, and that has been reaffirmed by the ICJ since then, not obviously the Sovereign Immunities Act, but this principle of international law. So we believe that that is why the binding principle in the sense of stare decisis, no, Your Honors. But in terms of understanding what Congress meant when it used that language in the statute, yes, we do think that those decisions of the ICJ have to be taken into account. I'm sorry. Do you have any other questions on this issue, Your Honors? No. But let me very quickly say, in answer to Your Honor's initial question, the case, which I think Your Honor might be thinking of, is IT Consultancy of Pakistan, 351 F. 3rd, 1184. That, I thought, was on the question of facts versus law. Yes, Your Honor, and I just wanted to – you asked the question as to whether a case could be brought to your attention, and that's the case. So, but that doesn't resolve the particular problem I have here, which is one part of the law has been decided and the other part hasn't been. And that's what I was wondering. Let me explain, Your Honor, so that I'm more familiar with that part of the case, I think, representing the parties at the time. When we made the motion to dismiss based on sovereign immunity, we were faced with a series of discovery requests that the plaintiffs put out. Those discovery requests tended to revolve around two issues. One was the foreign nonconvenience part of the motion that we made, and the other was this nexus under the expropriation provision, because it's our position that the entity which owns and operates those rigs is not an agency or a totality of a foreign state. And the plaintiffs said that they were entitled to significant amounts of discovery in order to determine the relationship between Your argument is that it's not as a matter of law or not as a matter of fact? As a matter of fact and as a matter of law. Are they independent of each other? I think that one is a question of Venezuelan law, because the other issue which they want to explore is whether or not, even if this subsidiary of PDVSA, which would not be an agency or a totality under the Dole decision, even if that, in fact, is the entity operating the rigs, that the relationship between the subsidiary and PDVSA is such that the corporate veil should be disregarded and should be considered to be PDVSA, and therefore they would satisfy the statute. Are you telling me that on the nexus issue, which we'll call the nexus issue, that that can't be resolved on the law, only on the facts, and therefore under the IT case, it's appropriate to... Yes, Your Honor. And that's why, in order to obviate the problem, the problem that one is faced with is, of course, even when you have the right to some jurisdictional discovery, the law in this circuit, as in others, is that every effort is to be undertaken to see whether the case can be disposed of on grounds which would obviate the inquiry. I understand that point, but, I mean, obviously the other claims are being attempted to be resolved just on the pleadings, and the question is whether this could also be resolved on the pleadings. You're telling me that the second half can't be decided on the pleadings. No, Your Honor, we don't believe so. They're going to make a factual, their position, the plaintiff's position, is that, in fact, the statute's nexus requirement is met because of this set of facts which they intend to... Your Honor, I'm asking you whether you have a legal argument which would, regardless of the facts, resolve this question. Well, Your Honor, our legal argument is that the entity which is operating the raids, and we made this argument, is not an agency or insurantality of a foreign state. Therefore, the nexus requirement does not apply. They've taken issue with that as a factual matter. If the court, and to obviate the need to have the discovery and the intrusiveness on the state and the burdens, we entered into the stipulation, which the district court judge approved, which attempted to see whether or not the case could be completely resolved on these legal issues. If it can't be, we'll be back there. Now, what about the violation of international law part of the requirement, that it be rights and property taken in violation of international law? I think your position is that even if there are rights and property, they weren't taken in violation of international law, right? No, I think part of the problem here is those two phrases cannot be unpackaged. Rights and property taken in violation of international law has to be looked at as one unified concept because if the court determines that under a broad, let's say a broad Article III standing argument, that a shareholder, yes, a shareholder has a property interest in the assets of the corporation, right? For Article III purposes. That then cannot inform whether or not under international law the same thing is true and whether or not a U.S. shareholder can assert a right and property taken in violation of international law when the property of the subsidiary has been taken. So the two concepts are married. Mr. Sorensen? Right. You argue with respect to HPV that HPV can't proceed because it's a domestic corporation. The domestic taking provision prevents HPV from proceeding, right? Isn't that your position? Yeah, sure. Okay. So if the property was not seized in violation of international law with respect to HPV, then what difference does it make whether HPIDC has rights and property? It wasn't taken in violation of international law. Why isn't that your argument? The argument, maybe I'm not following you on it. Perhaps we're saying the same thing. The argument that we are making is that HP's rights, which are in the shares of the company. It's HPIDC. I'm sorry, HPIDC. I was asking whether if we resolved the HPV issue in your favor, that is, that its property was not taken in violation of international law because it's a domestic corporation, right? That's your argument, isn't it? Yes, yes. Okay. Why aren't you arguing that that resolves this issue? That is, even if the property was taken in violation of, quote, rights and properties, it wasn't taken in violation of international law. That's essentially, I think you may have cast it more artfully than we did, but that's exactly what we are arguing. That's not the way you answered Chief Judge Garland's question. You told me that, you told us that these are, you can't unpack these phrases. I didn't understand what you meant. It says, it says rights in property taken in violation of international law. So we have to decide two questions. Does HPIDC have rights in property? And if so, was it taken in violation of international law, right? Your Honor is correct. The assertion by the plaintiffs is that they do have those rights. Those rights were taken because that property was a significant part of the- I don't understand all that. I was simply following up on Chief Judge Garland's question to you, whether we can resolve this case now. And I thought you said to him, we couldn't, because what it was taken in violation of international law was not before us. No, no, I'm sorry, Your Honor. I didn't mean to say that. So I misunderstood you. I did not mean to say that. The point that I was making, which is not before the court, but the factual issue is whether or not the property is now being operated by an agency or it's held in a foreign state that does business in the United States. Okay, all right. But, Your Honor, I understand you're exactly, that's exactly correct. All right. So just to be clear on this unpacking thing, your view is that if it is correct that IBC has rights in property, then the taking would be in violation of international law. That is, assume we lost the first part, assume we agreed, assume we held that they do have rights in property, IBC did, okay? Then, is there anything left to the question of whether the taking was in violation of international law? I think there is, Your Honor. What's left? Because what's left is whether or not the act of Venezuela in expropriating the property of its assets is owned by its national, and that's not in dispute, whether that can ever constitute a violation of international law. And we submit that it cannot. So that is a bright-line argument of law that could be decided at this stage? Yes, Your Honor. Yes, Your Honor. Did the district court decide that? The district court decided that H&P Venezuela had no claim because there was no violation of international law in the taking of its assets. However, it held that the case, nevertheless, came within that narrow group of cases, like the Siderman case and a couple of others, where the courts have said that where the entire entity, and in fairness, really the shares of the entity are taken, then the shareholder has standing. The Siderman case was different. That's the rights in property part. Right, that's a different hypothetical. Imagine that they own the stock and that the stock was taken. Okay? Yes. Then they have rights in property, right? Yes, sir. Now, let's say Venezuela did that rather than just took the assets. Would that constitute a violation of international law? It could if there was not prompt, adequate, and effective compensation, yes. Now, is the question about prompt, adequate, and effective compensation a law question or a fact question? I think it's a mixed question, Your Honor. It depends on what actually happens. So it's not one that could be decided on the pleadings. Well, I don't think so. All right. I'm sorry, you don't know? Yes. Okay, so now I completely understand your position. Let's assume that we agree with the district court that as to HPV, there's no jurisdiction because the property wasn't taken in violation of international law because it's a domestic corporation. Okay? Yes. All right. Is it your position that that holding by us, if we agree, also resolves HP IDC's case? We believe that it can, yes, Your Honor. Can or does? It does. Okay. Okay. Now we've stopped you from arguing the main thing you've got up to, so please go ahead. Thank you, Your Honor. In the time you don't have remaining. Frankly, Your Honor, I'm lost on the time. It was direct effects, if you want to know what to say. It was a direct effect. Just to put this in context, the contracts that are at issue here are contracts that were, according to the complaint, negotiated in their entirety in Venezuela between two Venezuelan corporations. They were executed in Venezuela. They're governed by Venezuelan law. The original of the contract is in Spanish. They had Venezuelan choice of foreign clauses in them. And the performance obligation, which is alleged to have been breached, is a payment obligation, which each and every contract placed solely within the discretion of Pervasive Petroleum as to where that obligation would be discharged. If the obligation was discharged in dollars, payment was to be made in a bank account in Tulsa. If the obligation was to be discharged in bolivars, it was to be made, put into a bank account in Caracas, Venezuela. And every contract makes it clear that in the sole discretion of Pervasive as to whether or not it would pay in bolivars or whether or not it would pay in dollars. The contracts have an Exhibit A. Exhibit A are the specs of these rigs, which are, as I understand it, fairly involved complex pieces of machinery. And in the listing of the specs, there are statements as to certain pieces and not even where they're – it says nothing about where they're manufactured. It says GE, for example, in one spot. And it says Vapor, which I understand is a U.S. company in another spot, with respect to certain components of the rigs that were the subject of the lease. There is nothing in the contract which requires that HOP Venezuela purchase anything from a U.S. company or purchase anything in the United States. And there's no allegation in the complaint that there is. And the closest that any assertion in that respect is made in one of the briefs that was submitted. Can I ask – so given that the Supreme Court has said that foreseeability isn't the issue, imagine that the facts were that the only place they could be – they specify a particular GE part. I'm taking that as given for the purposes of this question. And the facts are that the only place it could be purchased is in the United States. What happens then to your argument? Your Honor – We agree that the contract doesn't have to say you must purchase it in the United States, right? That would be a foreseeability problem. The issue – I agree with you, Your Honor, and I don't think it's a foreseeability issue. I think it's the difference between laying at the door of the defendant or laying at the door of the plaintiff the decision to perform some significant obligation in the United States. That's the test this Court laid down in DeSable, and it was just recently reiterated in the O'Donnell case. Where you have a direct effects analysis in a breach of contract case, the real aim of the analysis has to be where was the performance to be made. I thought your argument was that these third-party contracts were not breached. And they were not breached. That's another – yes, Your Honor. So if that's right, it sort of doesn't make any difference under your theory, right, whether or not the contract required or implied the need to buy parts in the United States. Your point, I thought, was that those contracts were completed, right? It was a breach of them. Your Honor – Am I wrong about that? No, you're not wrong. It's both points. And the reason for making those points is because the district court's decision was – he believes he was governed by this court's decision, Cruz Connections, and never got to the place of payment, place of performance argument. The key distinction between this case, these contracts, and the situation in Cruz Connections is that in Cruz Connections, in fact, the contract did require that the plaintiff enter into contracts with U.S. companies in order to perform its obligations. And the repudiation of the contract by the Royal Canadian Mounted Police led inexorably directly to the loss of those contracts, the inability of the plaintiff to perform those contracts and the loss of revenue on those contracts. So there was both a contractual obligation, which was something that was in the contract, and there was a direct effect, if you will, on those contracts because of the action of the defendant. Here, two things. One, distinguishable because the contract in our case is not anywhere near what the contract was in Cruz Connections in terms of requiring the plaintiff to enter into third-party agreements in the United States. And secondly, there were no breaches of those third-party contracts that resulted from the failure to pay. They said that. This is – Suppose you're wrong about the first part, then. Suppose you're wrong about the first part. I mean, look to me like at least much of the equipment that was purchased in the United States had to be purchased in the United States. There's no allegation of that, Your Honor. But does that make any difference to your case? Why do you keep arguing this? At the end of the day, Your Honor is absolutely correct because there was no interruption. I mean, you keep arguing, which makes me wonder whether or not I should worry about your argument that there's been no breach of the third-party contracts. Your Honor, I can point the court to, I think, several parts of the complaint where the allegation is specifically made that the third-party contracts were never breached. Were what? Were never – that the third-party contracts were never breached. I hear you, but given your continued focus on – given that, is that in your view dispositive of the direct effects issue? In other words, let's assume that the contract expressly required that certain types of drills be purchased from certain manufacturers in the United States. Okay? Let's assume it was right in the contract. Yeah. And let's assume that those had all been purchased and it was over and there's no breach. No direct effect. Okay, so then what difference does it make what the contracts say? Your Honor, I'll focus my argument on the fact that the contracts, third-party contracts, were fully performed. Okay. And, therefore, no economic effect in the United States. Can I just interject a question about that, though? The first prong of this isn't the direct effect prong. That's a separate prong. The first prong is based upon a commercial activity carried out in the United States by the foreign state. Does that also have to have a direct effect, that prong? No, Your Honor, but there's no – they are not relying on that. They've never argued that that prong of 605A2 applies. Is there any factual allegations carrying on in the United States? I'm sorry, Your Honor. Any factual allegations that come from them? No, Your Honor. Not anywhere in the complaint. So they're not arguing, then – and I'm sure they'll let us know – but they're not arguing, then, that the formation of the contract with the third-party provisions in it was itself a commercial activity carried out in the United States? No, Your Honor. It's interesting, and it's a point that they make. But what they do is they use the contract formation argument in isolation of the based-upon language in the statute. So this Court's decision in Perkin and the Supreme Court's decision in Nelson is that where you proceed under the first prong, where your claim is based upon commercial activity carried out in the United States, that an essential element of the claim that occurs in the United States is sufficient. So in Perkin, it was the sale of airline tickets by Air France in the United States. In Nelson, it was wherever the contract was entered into. If, Your Honor, this was a case where the contract had been entered into in the United States, contract formation was in the United States, and everything else is as it is – performance in Venezuela, all the other things I said – then I think they would have an argument. Then they would be able to say that their claim was based upon commercial activity carried out in the United States because contract formation would be an essential element of the claim. And that's consistent with all of the jurisprudence on long-arm jurisdiction and due process, which are concepts that Congress specifically said it had in mind when it drafted the FSIA. So there's nothing remarkable about that. When you try to conflate that with direct effect, their argument is an element of our claim is contract formation. And they go so far as to say, and from there on, it doesn't matter what the contract required or didn't require as long as the plaintiff unilaterally established a stream of commerce in its performance between Venezuela and the United States. That is the direct effect, and that's sufficient. So what that analysis does is turn the entire contractual, or rather jurisdictional analysis on its head, focuses entirely on the unilateral activities of the plaintiff. And the Supreme Court has very recently said in the Walbury v. Fiori case, you can't do that. The assertion of jurisdiction has to be premised on the activities of the defendant and not plaintiff's activities. And, in fact, that was the basis, the linchpin of this court's decision in Ollambo, where the court said that, I believe it was Uganda, couldn't be subjected to jurisdiction here because Ollambo decided to come to the United States. You couldn't premise anything based on the relationship that was established unilaterally by the plaintiff. It had to be on the acts of the defendant. So your Honor's question is a good one, but they're not asserting the first clause. They're asserting the third clause, but they're making first clause arguments in order to support their third clause assertion from the basis of jurisdiction. And as the court said in Ollambo, the analysis for direct effect in a contract case is whether or not the contract required or contemplated or necessitated performance in the United States. If it does, the failure to perform that obligation is a direct effect. If it does not, then there is no direct effect. So the analysis here has to focus on where the payment obligation was. And the contracts are very clear as to that obligation being within the discretion of PETA-BASIC could discharge that obligation in Venezuela. Now, there is an argument that was made that, well, because so many payments had been made in the past in dollars, that establishes some sort of obligation, course of dealing, what have you, which makes the United States the place of payment. There's several problems with that. First of all, there is no case or doctrine, which I am aware, that when the parties have specific written agreements with specific provisions and provisions as these contracts do, that any waiver or change in those provisions has to be in writing. You can't change the provisions through course of performance arguments. That's number one. Number two, there's nothing in the contract which suggests that prior notification had to be given by PETA-BASIC before it made a payment in bolivars as opposed to dollars. And in fact, when you look at the complaint, and it's paragraph 56 of the complaint, the last payments that were made under these contracts were made in bolivars in Venezuela. So that's where the parties were. That was the expectation of the parties. The contract never required PETA-BASIC to do anything in the United States. It was solely the business discretion, the fact that prior payments had been made. If you look at the Goodman case, there were payments that were made out of the bank account in New York on prior occasions. The court still said there was no direct effect because payments going forward or there was no requirement in the contract, and the contract could have been satisfied by payments out of anywhere in the world. What about the McKesson analysis, the interruption of the constant flow of goods between the two countries? Yes, Your Honor. In this case, thinking about it as the flow of capital, at least, or also the buying of parts and that sort of thing. Your Honor, in McKesson, an immediate direct consequence of the corporate interference by the government of Iran in the dairy resulted in Formos McKesson being ousted from its role, and there was an immediate stop of this stream of commerce resulting directly from the interference in the rights of Formos McKesson by the government in Iran. That's not alleged here, and that's not the case here. Whether there's a stream of commerce going back and forth really isn't the issue. If interruption alone is sufficient to constitute a direct effect, then that interference has to be the direct result of the action by the defendant. And here, as they said, that wasn't the case. The contracts were all performed, not just the third-party contracts, these drilling contracts. H&P Venezuela finished all their obligations under the drilling contracts, and then they said we're not going to renew the contracts. They had all expired. They decided they weren't going to renew the contracts until they worked out the payment problems with the government. So on that theory, it doesn't matter whether you had a choice of dollars or boulevards. You're saying there was nothing to be paid anyway, or is that wrong? What I'm saying is, Your Honor, I... Were there still payments to be made regardless of where they were to be made? Yes. There were. Yes, by control of the defendant. And what would be the briefest statement you could give on the difference between this case and the McKesson case? McKesson was not a breach of contract case and did not... Just on the question of direct effect, what was the difference in direct or not direct effect between McKesson and Venezuela? The cessation of the flow of commerce between the United States and Iran was not the result of a decision that foremost McKesson made. It was the direct result of the wrongful conduct alleged on the part of the government of Iran. And in this case, that is not what's being alleged. The allegation is they chose not to renew the contracts. Now, whether they could have even renewed... The contracts expired. Whatever flow existed may or may not have continued. Those contracts may or may not have been renewed. They may or may not have been renewed on the same terms. You know, looking at this in terms of what the business relationship had degenerated into, it's hard to believe that or to speculate that the parties would have entered into identical contracts with identical provisions with all of the same things we're talking about here. But whether they would or not, it's pure speculation, and that in and of itself makes this an indirect effect and not a direct effect. I think you may be saying you can't briefly tell what the difference is. I wasn't brief enough, Your Honor. I'm sorry. There's nothing you have to briefly make clear. Are there further questions from the bench? I don't have any more. Thank you. We'll hear from the other side. Good morning, Your Honors. My name is David Ogden, and I represent the Apolyte here, Helmer & Payne International Drilling Company, and it's holding on subsidiary Helmer & Payne of Venezuela. I'd like to start by just focusing on the core allegations of the complaint and what this case is fundamentally about to make sure we don't lose sight of it in some of the welter of detail, and then I want to turn to the detail of the legal analysis. Fundamentally, this is a case in which U.S. nationals owned and controlled a successful oil and gas drilling company in Venezuela. For 50 years, that business provided drilling services there. For the last two decades, exclusively to Venezuela's state-owned oil companies who are the defendants here. Under that arrangement, a series of short-term contracts between the parties would be carried out, performed, and be renewed. And at paragraph 34 of our complaint, the Joint Appendix 24, we squarely allege that the parties anticipated that all of the contracts would be extended beyond their original terms, as had occurred with prior contracts for many years prior to the breaches and the confiscations here. Hence, the contracts contained renewal or extension provisions which were routinely exercised by the parties for 20 years. The way this course of business, the McKesson-style course of business, was carried on was through a series of short-term contracts that the parties expected to renew and did, with the same terms carrying over from contract to contract. So this cycle of performance and renewal is essential to understand the way that the commerce in this case proceeded and the allegations of our complaint and all of the direct effects analysis that Your Honor has. Do the arguments depend on there being some kind of violation of international law and refusing to re-up contracts? With respect to our contract arguments, Your Honor, those are just straight commercial law disputes under which we have jurisdiction under the commercial activities exception. And that's a direct effect dispute. That's what, exactly, Judge Sentelva. The issue with respect to that is direct effects. And so on the former issues, the expropriation issues, we need to allege a colorable non-renewal. But on the renewal of contracts, there's no claim that they had to leave aside that they breached the existing contract. There's no claim that they would have had to have renewed their contracts even if there had been a course of dealing. Is that right? The practice for 20 years, the complaint alleges that the practice for 20 years had been that there would be performance followed by renewal. These were 11 enormous expensive drills. I understand. But does your breach of contract claim include a breach of the refusal to renew? No. The breach of contract claim is that they simply stopped paying. Right. So I think Judge Sentelva started asking the same question. If the contracts were already performed, is anything that might arise out of the failure to continue to renew to keep the relationship going, was that a direct? Can that be counted as a direct effect? Yes, because what we've alleged is that there was an understanding of practice, an ongoing practice of performance by both sides followed by renewal. This was incredible. We could possibly recover for a breach on the basis of non-renewal. No. But don't you have to show a direct effect in the United States from the breach of the obligation to pay without regarding renewal, which is not obligated under the contract? The direct effect from the failure, there are multiple direct effects. As we've alleged in the complaint, there are direct effects from contract formation. What's the first one? There are direct effects from contract breach. What's your first one? The first direct effect. The first direct effect, well, I don't know how it flows in time. The first one you want to tell us about. Let me tell you about the direct effects of contract formation. Under Kirkham, it's clear that the act by the defendant that gives rise to the duty that is alleged. Let me tell you, but isn't Kirkham, didn't Kirkham involve a different section of, it involved an act, the sentence it's about an act performed in the U.S. in connection. This is a different provision, isn't it? It's the same base. It's the same what? It's the same statute in the same statutory section. There's a different clause. There are three clauses of that section. You're right that this one is in connection with a commercial activity of the foreign state elsewhere and that causes a direct effect in the United States. Isn't that what this one's based on? Yes. Okay, so it doesn't make any difference. That's all we have to look at, right? Is there a direct effect? The question is, is there a direct effect? Kirkham has nothing to do with this. No, Your Honor. Kirkham, I assume, has everything to do with this question. He does? Yes. Kirkham, the question that this Court answered in Kirkham was, what act was Ms. Kirkham's claim based upon? That was the question. The same base, the word base, applies to all three clauses of Section 1605A2. All three clauses have the same base, so a claim under any one of the three clauses, the analysis as to whether what act it's based upon is the same. Here is clear, but you said that. That's one of the things. What is the direct effect? Under Kirkham and Nelson, a claim is based upon any fact that the plaintiff needs to prove to prevail. We need to prove two core things. One, that they undertook an obligation, they undertook an obligation to make payments. You seem to be intent on not answering the question of what the direct effects are on a crime of breach. You've already admitted, Your Honor, that the breach of the obligation to pay is what you're suing, right? You don't need Kirkham, you don't need anything else to say that you're suing because they breached the obligation to pay, right? Let me answer the question as to what the direct effects of the breach are, and then I'll come back. We are suing on the breach of an obligation to pay. Yes. Now what's the direct effect? The direct effect of the breach were, number one, the inexorable result, as in cruise connections, the inexorable result of the breach was to interfere with decisions by the plaintiff and third parties to enter into necessary commercial transactions to carry out the ongoing course of conduct. Okay, but in cruise connection, the contract was with U.S. The contract required that the subcontract with U.S. ships, and those contracts were breached, whereas you seem to concede here that the third-party contracts were not breached, that the direct effect is the fact that there weren't future third-party contracts. The direct effect is that because of the natural result of failing to perform, broke the cycle of performance and renewal, the obligations under these contracts that were routinely renewed were no longer performed. Okay, but do you agree that under cruise connection, we specifically said the contract required that they contract with U.S. ships, and the comparable contracts here with third parties have not been breached, correct? Your whole point, I thought, was that there's this decades-long pattern of renewing contracts, correct? Yes. And the direct effect is that that pattern has been interrupted, correct? Correct, yes. Okay, so cruise connection doesn't help you because cruise connection was an actual breach of the contract. In other words, this case would be like cruise connection and if one of the contracts to purchase oil equipment in the United States had been breached, then you'd have a cruise connection case. Cruise connection, I believe, Your Honor, was a case in which there was an actual breach, alleged to be an actual breach by the RCMP, that caused other parties to back out of a contract that had not been formalized. The contract required that they hire U.S. That's what I'm saying. The contracts were similar in the sense that in your case, your point is that the contract required purchasing from U.S. sources, right? Correct, yes, sir. Okay. That's true also in cruise connection. Yes, Your Honor. The difference is that in cruise connection, that contract was breached. In this case, it wasn't. No, Your Honor. I think in cruise connection there was a contract that was breached, but there were also two contracts that had not been entered into. And the problem was that when the assurances of tax treatment were not provided by the Royal Canadian Mounted Police, the folks who wanted those assurances backed out of entering into deals that would otherwise have occurred. Under the contract. That would have occurred under the contract. That would have occurred under the contract. Your current contracts don't require future contracts. Your whole argument is there's a pattern. As in McKesson. Okay, so we're now away from cruise connection. No, but the point of cruise connection is the type of effect that was caused here is like the type of effect in cruise connections. It is a backing out of contractual arrangements, a non-fulfillment of U.S.-based contractual arrangements that would have occurred had there not been. Wait, what contractual relations are they backing out of here? Here, we are not going to be continuing to purchase these apartments. Ah, future. It's not backing out of a contractual relationship. It's not engaging in future contractual relationships. And that's the direct effect, Your Honor, of the breaking of the ongoing. And your best case for that is cruise connection? Cruise connection points to the type of effect. Do you have any other cases? The McKesson case is about active defendant that inexorably caused a breakdown in an ongoing and well-established pattern of dealing. And here, those are direct results. Let me turn now to the payments themselves. Before I do that, let me just ask one more hypothetical with respect to this. Imagine that there had been no expropriation at all. Okay. All that happened is Venezuela said, we're not going to deal with you anymore. Sorry, we're going to deal with the Russians or some other entity that doesn't buy in the United States. Would that, would you have a claim then? Would you have a direct effect on the United States then? Well, we would on two other things, Your Honor. I don't think we, I think our argument on the one on... Even on part of a loan? I think the one we've been talking about would be harder because in that circumstance, the brief would be accompanied by a termination of the ongoing. Some other factors which might complicate the claim, but this was an ongoing arrangement that there was an expectation it would continue. Well, assume there was an expectation that everything would continue, but not a written expectation, and there's nothing in the contract that provided that re-upping was required, which I assume is the case here. There was nothing requiring, right? That's correct. Okay, so what if Venezuela just decided, we're going to, you know, Russia has agreed to put in rigs. We're just not going to use you anymore. Sorry. What would happen? Then they couldn't say that this was a direct effect of anything that violated international law, right? And again, it would violate the contract to fail to pay. But the paying doesn't affect anything in the United States other than the receipt of capital in the United States, right? It doesn't involve these third-party parts suppliers at all, right? It involves it because it is the inexorable, direct, unmediated result of that failure to pay that this long relationship like the commerce at issue with McKesson stopped. When one party fails to perform and stops paying for services, those services won't be provided anymore, and the provision of those services necessarily involve commerce in the United States. Let me turn, in your hypothetical or in our circumstance, it's also the case that there was, in fact, an expectation of payment in the United States. These payments were supposed to be made here. Under the IT consultant case, this court credited, as it should here, the allegations of the complaint with respect to the obligation to pay in the United States. Here, we've, and essentially, in IT consultants, the court said that it credited the allegations of the complaint that there was an obligation to pay in the U.S. In this case, doesn't, don't you, I thought you conceded that Venezuela always retained the right to pay in boulevards in Venezuela. We don't concede that, Your Honor, and what we allege is a complaint. There are provisions in the contract that say that. What about, what about page 67 of your brief, footnote 27? You concede, the way I read this, you concede that, quote, defendants could elect the option to pay in boulevards. Just looking at the footnote, Your Honor. I thought that that. No, there is language in the contract that affords that. There's also language in the contract, which we explain in our briefs, that restricts their ability and right to exercise those options. They're only permitted to do so if they make, for example, if they make a good faith judgment that boulevards have become convertible. And we allege that there was no period during the, during the timeframe. What about this kind of language that they quote? It says, it says that the Venezuelan company shall always have the right, at its exclusive discretion, to pay a portion established in dollars or in boulevards. Retains the, retains the, retains, shall always have the right at its exclusive discretion. There's, there's, there is language in the contract that, that makes clear, we believe, I mean, the contracts have a lot of provisions in them. We allege that the contracts, the course of conduct, the documents that are contemporaneous to make payment, there are specific statements that payments will be made in banks in the United States. Mr. Best, can you just, I have the same documents that Judge Cagle does that seem to cut against you. What would, what would you point us to, what page of the appendix would be the best argument that it's not in the discretion of Venezuela? I'm sorry, I didn't mean to put you on the spot, but take a minute and find it because I think that's what we're trying to focus on. The, the, the, the, the key line, do you know what you have there? The Joint Appendix, right there. So Joint Appendix 185 and 469. Let's do one at a time. 185. Joint Appendix 185. Uh-huh. What, where, where are we? I'm sorry, Your Honor, I'm, I, I, I'm concerned about, I'll tell you what, while we continue to ask the questions, your colleague can look for that. All right, so I guess this is, you know, apologies, I'm looking at Joint Appendix 742, which are, which are these minutes from the June 2nd, 2008 meeting that amends the contract. Well, so I'm looking at the fifth paragraph, which says, without prejudice to all that is set forth above, the present agreement regarding partial payment shall cease to be in effect when PDVSA deems it discretionarily appropriate, in accordance with its interests, and considering changes in its policies and internal rules. And we've alleged that, that defendants never made such a decision, that the invoices were issued and approved by the defendants, many of them, to pay in the United States, never having made such a decision, and we're now five years downstream. Is it incorrect, then, that the last payments were made in boulevards? There were certain payments made in boulevards, Your Honor, but it's not in the record whether those were payments of the U.S. dollar invoiced amounts. There were, there were invoices issued in dollars and invoices issued in boulevards under the agreements, and, and it's not, there remain invoices issued in dollars that were approved in dollars by the defendants, according to the allegations, that have not been paid. They had a, they were under this particular agreement. They needed to exercise that discretion and terminate the agreement that would have a broad effect. They never did that, and so their obligations remain. Why do they have to terminate, why do they have to terminate the agreement? It says, it says, without prejudice, all that is set forth above, the present agreement shall cease to be in effect. And is that agreement, that's just the payment agreement, not the? Our position is that they had to abrogate the agreement, not the agreement. What agreement are we talking about now? Which agreement do you think they have to abrogate? I think it's somewhat ambiguous, but even if it applies only to this one, even if it applies only to this specific agreement to pay $61.39. Yes, because it sounds like it, because it's in a paragraph that begins with the following sentence, in accordance with the foregoing, this payment agreement is made under the following terms. And then number five, which refers to that present agreement. It certainly sounds like it's the payment agreement, doesn't it? And what it would require them to do is to terminate the agreement of $61.39 altogether, which they never did. And the reason they never did that, Your Honor, if I may, is that to do so would have basically been the end of this arrangement. They would have, because they had to make payments in dollars. Everyone understood it, and we've alleged that they understood it, and everyone knew it. But they admitted they turned down to make payments in dollars. I'm sorry, Your Honor. They admitted they made some payments in dollars. It was expected they would make some payments in bolivars and other payments in dollars. That was the arrangement, that there would be payments made in bolivars in Venezuela, there would be payments made in dollars in the United States. All dollar payments had to be made in the United States. They made $65 million worth of such payments in the United States as a result of these contracts over the years. And the fact of the matter is that the fact they paid some in bolivars doesn't mean they had elected to pay the dollar invoices. If you needed a formal election and a formal termination, would you not have said so more expressly than what the language that was just read says? I think, Your Honor, that if you gave a complete reading to this document, you'd have to say that either party could have clarified the rights better than they did, but these are the contracts that we have. Yeah, the ones we have. And that you have. Well, even the ones we have. And we allege, and I think a fair reading of the contracts should allow us to prove this below, that the contracts, the course of conduct, and the contemporary documents, including these minutes, created an obligation. And under IT consultants, a far flimsier set of factual allegations were deemed sufficient to allow a complaint to go forward. There the court credited the allegations and said, okay, this is enough. You can go back and prove it. We believe we can prove that it was an obligation. But beyond an obligation, under ODIAMBO, this court has said it's either a requirement or a necessary contemplation of the contract that there be payments in the United States, that they would either be required or necessarily contemplated. And if there were not dollar payments made under these contracts, there would be no relationship, because the bolivar fuerte is an inconvertible currency. No U.S. entity, as this is, would have continued to do business with a company that wasn't paying it in dollars. It had to buy parts in dollars in the United States, as we've discussed. It had to make a profit. Bolivar fuerte are useful only in Venezuela. So it was necessarily contemplated that some payments would be made in dollars, and as they were for 20 years under the agreements. Finally, on the direct effects point, Your Honors, if I may, I do think it's important. I don't want to walk away from the Kirkham point. I do think it's important that under Nelson and under Kirkham, a claim under any of the three prongs of the statute is based upon any fact the plaintiff finds necessary that is necessary for the plaintiff to prove its claim. That's what based upon means. The word based appears once in the statute. It has to mean the same thing for all three prongs of the statute. And in Kirkham, this court said, and it's entirely consistent with Nelson, that a claim is based upon acts that give rise to the duty that was breached. In Kirkham, the claim there was based upon the purchase of a ticket, because the ticket created a duty that was later breached. Here, our claims are based upon formation of the contracts, because the contracts give rise to the duty that was later breached, the duty to pay. It's exactly like it's based on the contract in the same way that Kirkham claim is based on the ticket. And that is a critical, that's critical here, because all of these other questions that we've been discussing become irrelevant once that's focused on, because they paid $65 million as an inexorable necessary result of the contract in the United States. Many, many products were purchased and acquired in the United States as required by the contract, as a direct inexorable result of contract formation. So because this claim is based upon the contract formation, in the same way that Kirkham claim is based upon the ticket, these direct effect issues are varied. Mr. Ogden, can I ask you to go on to the expropriation? Yes, thank you. I'd like to do that. No, no, you covered all the points. Let's get back. Could you start with H.P. Venezuela's claim and explain to us why that isn't barred by the domestic taking law? Why that's not barred by the domestic taking law? And why, since it's a Venezuelan corporation, why it's a taking violation of international law? Well, under the Sabatino and Farr approach. Suppose we don't think Sabatino is either any longer very helpful or that it's just grammatically different, because in Sabatino there was evidence in the official documents that it was aimed at Americans, whereas here I didn't see any of that. Just assume for a minute that we don't think that gets you anywhere. Or does your whole case depend on that? Well, our whole case depends on the proposition that this was a discriminatory taking, and it's squarely alleged that we have not only a conclusory allegation to that effect, the record is replete with expressions directed at this expropriation explaining that this was done because this is an American company. But isn't it true that in Sabatino the official documents refer to these being American companies, and that it was anti-American? Whereas here, what's the best evidence in the record, official evidence in the record that indicates this was anti-American as opposed to what Venezuela says, which is they just wanted the rigs? Well, there's extensive evidence in the complaint joint appendix 14, joint appendix 38 to 43. Of anti-American sentiment. Directed at this specific here. Now, the minister of oil of Venezuela is the same man as the head of PDVSA. PDVSA is an instrumentality of Venezuela. The government, the minister, the president, and the company said the following. They publicly condemned the subsidiary as the U.S. transnational firm, a USA company contractor, said its employees would no longer be exploited by this American company because of this taking, and that they and the drills would now work for PDVSA, a company of all Venezuelans. That is a pretty clear statement in connection with this taking, that it is targeted at a U.S. transnational firm in order to transfer its operations to a company of all Venezuelans. Isn't that a standard? Is this a fact question? Whether the taking was discriminatory? I think right now it's simply a question as to whether we've made colorable allegations. That's what I was trying to get at. So if there is a factual dispute, then that's for a later day in taking. But right now the only question is whether it's colorable. Correct. That's right. Under FABAD, that's correct. That's the only question now. Well, the FABAD question is whether the legal issue is colorable. This is a little bit more like a Twombly question, whether you've well pleaded facts that plausibly could be read this way, right? I think it's a question whether our allegations are colorable. Yeah. A conclusionary allegation would not be sufficient. You're saying you go far enough beyond conclusionary. Yes. We have several pages of remarkably clear statements of discriminatory intent that we rely on. I mean, I could read more of them, but they're in our papers. I mean, it's as jingoistic and as anti-American a rhetoric as one could lamentably imagine that denounced those opposing the nationalization as acting in accordance with the instructions of the U.S. Department of State and trying to subsidize the big business transnational corporations so that they can promote what they know best to do, which is war through the large military industry. These are the kinds of things that were said to justify this taking by officials. So then the long question is whether Sanatino and FAR are enough, right? Does it give us a colorable basis? I'd like to turn to what I think are just completely incorrect statements about what Barcelona, Trachten, and Diallo hold. First of all, those cases are not about this question. They don't involve discriminatory takings, and they don't even address the rights of a company to assert its own rights. They are about espousal questions, which nation may espouse the rights of a particular entity. And neither of them considers or forecloses the rule of Sanatino that was emphatically readopted in FAR. Barcelona and Trachten wasn't even about a claim against the nation of the incorporation. It simply involved which third country could espouse the rights of a corporation against the state. Another, and indeed it was a state of – it was incorporated in one state, shareholders in the other third state. Barcelona and Trachten expressly leaves open the question as to whether there are equitable exceptions, even in that – in a very different context. The restatement third specifically says that – at Section 213, Reporters Note 3, that Barcelona and Trachten does not preclude representation of the company by a state with significant links to the company against the state of incorporation itself. That's the restatement on Barcelona and Trachten. It just doesn't have any traction, if you will, in this setting. Diallo, thank you. It's been a long morning. I'm doing my best to keep it light. The Diallo decision doesn't either. It's not a discrimination case. There's no allegations of discrimination in that case, and it expressly leaves open the possibility that customary international law contains a more limited rule of protection by substitution. Again, in this very different context of which country can espouse the claims. So none of those cases and no international source that Mr. Pizzurro referred to forecloses the common sense rule of Sabatino. And that rule flows – it's not come out of thin air. It is a black letter proposition of international law. Why did the restatement third cut out the black letter part that really helped you a lot? Well, I think that the restatement third reorganized in many ways in certain things that were sort of principles that moved to comments. But here the restatement third, as Judge Tatel observed, specifically preserves the concept. But very much limited to the facts of that case. It says it recognizes the practice of the United States and others to make claims as the states of nationality of the parent corporation when a local subsidiary is expropriated on the basis that the expropriation was aimed at the parent company or at the state of the parent's nationality. That's quoted from the restatement third. And that's our situation. Sabatino, again, involved the discriminatory taking. And that is black letter law that – the prohibition against discriminatory takings is a prohibition that's found in the restatement squarely. It's found in the House report. Where is the – The restatement third of foreign relations law at section 712 says a state is responsible under international law for injury resulting from a taking by the state of the property of a national of another state that is discriminatory. That's of a national of another state. And so the issue here is there – does the Sabatino rationale come within that approach? And in the comment, the restatement leaves that proposition open. And as I said – To 712? The comment is to 713. Which is a remedies section. I'm not saying you're wrong. It's just not – No, it's – When you say black letter, I'm looking for the black letters. It's not quite that clear, right? Well, I'm making a limited black letter point, which is that discriminatory takings are clearly violative of international law. The question is what is a discriminatory taking? And we would submit that Sabatino certainly identifies a colorable idea of a discriminatory taking where a company like this one set up by an American entity to carry out – that is entirely a creature of that entity, 100% owned, as we allege was controlled in all of its operations managed by that entity, is – and when it is treated as a foreign entity by that government, given lesser rights because of its foreign ownership by that government, and then expropriated because of that foreign ownership, that that is a discriminatory taking. And that underlies our claim. And we don't think any international authority – Do you want to say something about IDC? I very much do. Thank you, Your Honor. Okay. And maybe you could answer – well, can I ask you a question to start with? Please. So assume we don't agree with you about HP Venezuela. Let's assume we think – it's a hypothetical – that we think the district court was right and that the seizure of – the expropriation of HPV was not a violation of international law because it's a domestic corporation. Just assume that, okay? Yes. Even if you're right with respect to IDC that it has rights and property, it seems to me – I thought that part of your brief was persuasive, that rights and property are different from ownership. Even if that's right, how can you prevail given that it has to be rights in property taken in violation of international law? Well – And it wasn't taken in violation of international law if the IPV seizure was not in violation of international law. Under the restatement third of foreign relations law, Your Honor, as I mentioned, a state is responsible under international law for injury resulting from the taking by the state of the property of a national of another state that is discriminatory or is – I was just asking you the question about the language in the statute. It says rights and property taken in violation of international law. I'm simply asking that if – even if we agree with you that IDC has rights and property here, how can we – how can you prevail if we also think that the subsidiary's expropriation was not in violation of international law? Because the taking is of the distinct direct rights of the parent and in violation of the principles of international law. The parent has a – I'm sorry, Your Honor. No, go ahead. Keep going. The parent has a – under the Ramirez analysis, the parent has an interest and a right in – But they didn't seize the stock here, right? That's correct, nor did they in Ramirez. And you argue that IDC – that the subsidiary is a continuing entity, correct? It's a shell, basically, that there is stock and no assets – no productive assets in it. We allege that all of the productive assets, including the employee – all of the relationships with employees have been taken, and there's nothing left of it as a business. It's been assumed and asserted as knowing concern. Okay, so under your view, IDC can prevail, that is, its rights and properties were seized in violation of international law, even if we conclude that HPV was not expropriated in violation of international law? Absolutely, Your Honor. Well, because IDC has its own rights and property that were taken in violation of international law, that is – Because IDC is a national of another country. Correct. And so a different rule about international law taking supplies than the V Company, which, for purposes of this hypothetical, is considered a Venezuelan company. That's why you can lose the Venezuelan one but not lose the American one. That's right, because the American company has its own rights that were taken without compensation. So you would have an independent conclusion that there were rights of the American company taken as opposed to simply the rights of the subsidiary of the American company? That's correct, Your Honor. And let me suggest – Now, is there a reason – and this may be an unfair question, but we get to the unfair occasion – is there a reason why IDC had to operate through a Venezuelan subsidiary? There's nothing in the record to suggest that they were compelled to do so, Your Honor. They had, for 50 years, had subsidiaries long before the Chavez regime had had subsidiaries in Venezuela that were operating, and they simply continued to do so. But I'd like to just, if I may – I realize I'm maybe imposing on you, given the time – but make two further points. In addition to Ramirez, in addition to the statements in De Mariam that support our claim that IDC had its own rights at issue – and there really are two critical points. The first is that the Restatement Third of Foreign Relations Law at 712, Comment G, expressly recognizes that even when left with title or other formalities of ownership, a property owner has a claim under international law when it has been deprived of its property in whole or in part, when the state, quote, prevents or unreasonably interferes with effective enjoyment of the alien's property or when it deprives an alien of control of its property. That's a functional takings analysis under Section 712, Comment G of the Restatement Third. And this is what Ramirez is talking about. If all of the benefit of the company is taken, all of its operating assets, it's taken in whole or in large part to prevent the parent from exercising control and benefiting from the property, that is a taking, a functional taking, analogous to the similar doctrine in the U.S. recognized in the Lucas case, a functional taking. You may still own the property, but if the state has deprived it of value and usurped control over it, that is a taking that's cognizable under international law as reflected in the Restatement. And the Restatement cites numerous cases to that effect. That's why Ramirez holds what it holds. That's why Numerian says what it holds. That principle is an understood principle recognized in international law. This is, we've alleged, a functional taking. Okay, we got that one. Do you want a second? And the last thing is I would just refer you to the Fletcher Cyclopedia of the Law of Corporations, which Your Honor mentioned, which specifically recognizes under black-letter corporate law that there is a big difference between the taking of some assets and the taking of all assets. A corporate parent has a right to object to block sale of all or substantially all the assets of the subsidiary. The subsidiary does not control that. That's black-letter along the U.S. and in Venezuela. Let me ask you one more question. I appreciate that you can't concede appellate jurisdiction here, but do you agree with opposing counsel on the questions I asked about the interlocutory appeal here? That is, are the remaining issues with respect to the expropriation issue, that is after rights and property, are these all essentially fact questions that can't be resolved on the face? What we tried to do, and that's my understanding of the situation. What we tried to do in the trial court was to isolate the issues that they were putting forward in motion to dismiss that raised pure questions of law and to reserve questions on which discovery might be necessary so as to protect their interest in being free from discovery while those rights were adjudicated. We tried our best to do that. I don't guarantee we got it right, but that was the theory on which we proceeded. Okay. Further questions? Thank you, Your Honor. No time left. We'll give you a few minutes. Let's make it a few if we can. Thank you, Your Honor. I believe Mr. Pizzurro would also like to do a rebuttal on the breach of contract issue if possible. Judge Garland, with respect to your jurisdictional question, I think the backstop to all of this is nothing else without pendant appellate jurisdiction over the IDC issue given the jurisdiction over H&P Venezuela. I think Judge Tatel Now, over what are you saying, pendent jurisdiction? Pendent jurisdiction over the issue of whether H&P IDC has correctly invoked this court's jurisdiction given the indefeatable jurisdiction over the H&P Venezuela issue. And I think that ties to the point that Judge Tatel you hit on, that if there is no taking in violation of international law, the only property that has really been alleged to be taken in this case, that disposes of both states. Well, but what about Mr. Ogden made the point that the rights and property of H&P IDC are different from He's made that point. Their interests are different. I don't know if he's That's not true? He has made that point. I don't think he's ever explained what those rights are. The only question that we're asking is whether these are independent of each other. And if we were to disagree with you and think that the American company actually has rights and property, the fact that the Venezuelan company can't win doesn't mean that the American company can't win. I think that's right, but I would refer you I thought you just said to me that wasn't right. Well, that is not Do you disagree with me? No, no, I wasn't saying what I thought. You said to me that if the subsidiary couldn't prevail because it wasn't taken in violation of international law, then IDC couldn't. That's what you said when you first stood up here. Yes, and I But then when Judge Garland asked you the same question, whether they're separate questions, you said they are. My point was that we disagree that there are independent rights in IDC. We believe all that IDC has alleged are rights that pass through the corporation, which is law that Just to be clear, imagine that you win on the Venezuelan point, the Venezuelan subsidiary. However, we say that Venezuela has effectively taken control, and we conclude as a matter of law that that means rights and property of the American parent have been taken. Assume that, then it is still possible for the American parent to win on a theory of a discriminatory taking against an American, not against a Venezuelan, right? Under that, yes, I apologize for the confusion. But again, I'm not sure Mr. Ogden has effectively explained what those separate interests are that IDC has. They seem to be all interests that pass through H&P Venezuela, which this court's Labovitz case, which we cited as a brief, explains if the entry passes through the corporation, it is not independent. Labovitz or Labovitz, I apologize. And this was a domestic corporate law case where basically they were saying demunition and value in the investment. And this court says, no, that's not an independent right that the corporate parent may assert. Briefly with respect to the discrimination claim, we don't believe, well, first of all, as you pointed out, the restatement allows discriminatory takings when the taking is from a national of another country, which is the problem here. That is not the case. Sabatino, I think, in addition to being before the Foreign Sovereign Immunity Act, was holding on the merits under international law. And at the time, the court believed it was its duty to expound upon and develop international law. And after so-so, we know that is really not the court's role with respect to international law. So for that reason, in addition, we would say – Is there any American case after Sabatino and Farr that goes your way? That is – Siderman, the Blake. I've read Siderman. I don't see it as holding this. The question we're asking is whether discrimination against a domestic company motivated by the foreign nationality of the corporation's shareholders. Assume that it is motivated, that the president of the country says, we are doing this solely and only because we hate Americans and we know this company ultimately is owned by Americans. Is there any case that is set under those circumstances that doesn't violate international law? I don't believe under that particular flavor of discrimination. Yeah. Discrimination more generally, certainly, that was the Siderman case. And, for example, the Holocaust cases where the courts have gone to great lengths to note the genocide component of the cases, explaining why there's been a violation of international law, would have presumably come down quite differently if there was this still existing general discrimination exception. We don't believe that there is still an active discrimination exception. I'm not sure I'm following that one. That one was against nationals of the country, discrimination based on their religion, right? Yeah, and I'm talking more generally about a discrimination exception, too. Yeah, but that's not what they're – they're not arguing about a general discrimination. They're arguing about a nationality-based discrimination. And it's still – I'm not – I think that's a distinction without a difference, because you're still talking about an offensive discrimination, whether that – The question is whether it's offensive enough for international law, not whether we find it offensive. And I believe that's correct, and I don't think any well-established norm of international law reaches that level. With Siderman, they let the American shareholder invoke the international ticketing exception. Yes, specifically because it was not a national Argentina. But she was a shareholder, right? Yes. Well – And in that case, again, the entire – that was the case where the entire corporation was taken was the fact the defendant in that case. So now you're relying on the take – and we're back to the question of whether it's the entire corporation. Yes, and I don't believe you can find a single case where – where it is a plaintiff in the lawsuit that both the parent and the subsidiary consortium agree. Are there further questions from the bench? No. Thank you, Your Honor. Thank you, Your Honor. That will be very brief. On the point of the subsidiary, I'd like to make the point that H&P Venezuela, in fact, is a plaintiff in actions that are ongoing in Venezuela. So it is protecting its rights in Venezuela as well as appearing as a plaintiff in this case. And as far as the record is concerned, and I believe this to be the case, retains all of the benefits and privileges under Venezuelan law that any other corporation does. For example, it still retains limited liability. If there were claims by former employees, by people who had been on their property in Venezuela, the limited liability of an SA under Venezuelan law, which is in the record, is retained by H&P Venezuela. It can't carry on its business anymore. It can't carry out its drilling business. It can carry out other business. It was formed for the purposes of the drilling business. And what it's doing, Your Honor, is trying to get those drills back. And it's doing it here, and it's doing it in Venezuela. And if it gets its drills back, H&P IDC has identified no injury at all that is different from the injury to its subsidiary and no recovery to which it is entitled at all in excess of the value of those rigs. So it is entirely derivative of H&P IDC's rights. It has no interest of its own that it has the ability to assert under very well-established principles. The question of whether... Do you believe that even if rights in property is different from share ownership? Even if, yes, Your Honor. Is your argument dependent on us accepting your position that Dole controls? How do you think about this? Your Honor, I think that the... Suppose we don't agree with that. In other words, we think that you're wrong about that. Rights in ownership, rights in property is different from ownership. If you're not taking an international law, a violation of international law, that's... Your position is still the same, that there is no right between here, between the two. Yes, that's correct. On the contract point, very quickly, I would like to... There was a question, Judge Santella, I believe, regarding the assertion that I had made that the final payments under this agreement had been in Bovar's. I refer the court to paragraph 56 of the complaint, which is at Joint Appendix, page 29. The allegation is the PEDAVASA defendants have not remitted any payments to HMPV in the United States since March 2010, and they have not remitted any payments to HMPV in Venezuela since May 2010. Clearly, they have alleged that the payments, final payments made under this agreement, were made in Bovar's. And there is no allegation that those payments were rejected. There is no allegation that those payments reached some obligation. There is no allegation that Petroleum had to invoke some formality of notice or termination of the existing agreements that gave it the absolute discretion. In fact, what they've alleged is that Petroleum exercised the absolute discretion that it had. Is it a matter that our case talks about a place of performance rather than the place of performance? I think, Your Honor, that when you look at the cases, I don't think it makes any difference. So, for example, the case that addresses that, I think, would be Goodman, because in that case, there were payments that were made from the U.S. accounts. Those payments could have been made from U.S. accounts. They weren't required to be made and, in fact, were not made, and the court rejected that there was a direct effect. So I don't think that there is any difference in that article. And finally, there are these arguments about that it was the expectation of the parties because of the Bulgarian currency and the risk, and no one would do any business with these folks if that's what the contract said. Well, that is what the contract said. They did choose to do business in Venezuela with that provision, and if there was a currency risk, which, by the way, in 2007-2008, when the contracts were entered into, it was not the same set of affairs as today, but if there was a currency risk, they took it on contractually. They can't come here now and say the expectation of the parties was different, that actually all the payments would be made in dollars because the economics would have made it untenable to continue that way. We never would have done business with them if that was the case. They did do business with us. That was what they agreed to. Thank you, Your Honor. We'll take the matter under submission.
judges: Garland, Tatel, Sentelle